UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN DEROI SAWYER,

    Plaintiff,

v.

CHRIS MACDONALD, et al.,

    Defendants.

Case No. 15-cv-00220-JD

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 40, 59, 61

Plaintiff, a state prisoner proceeding pro se, has sued under 42 U.S.C. § 1983 for alleged retaliation and violations of the First and Fourteenth Amendments stemming from the confiscation of his written materials. Defendant has filed a motion for summary judgment. Plaintiff filed an opposition and defendant has filed a reply. The motion is granted.

**BACKGROUND**

Plaintiff was transferred to San Quentin State Prison ("SQSP") on November 23, 2011, and his property arrived in December 2011. Am. Compl. ¶¶ 22-23. At that time defendant Sergeant Cavagnolo was working at SQSP as a Security Threat Group investigator, also known as an assistant institutional gang investigator. Motion for Summary Judgment 1 ("MSJ1") Cavagnolo Decl. ¶ 5. He was tasked with investigating gang activity and "validating" inmates who were involved with gangs. *Id*. ¶¶ 6, 8. California regulations prohibit prisoners from possessing material that is reasonably deemed to be a threat to legitimate penological interests. Cal. Code Regs. tit. 15, § 3006(c)(16).

Defendant and other gang specialists screen some inmates' property when they arrive at the prison. Cavagnolo Decl. ¶¶ 25-26, 28. On December 7, 2011, prison officials confiscated

some of plaintiff's written materials, and defendant kept the materials to review for possible indicia of gang membership. *Id*. ¶¶ 29, 31, 34; Opposition 1 (Docket No. 45) at 3. Defendant did not review the materials immediately. Cavagnolo Decl. ¶ 32.

Plaintiff began the inmate appeals process on December 28, 2011. Opposition at 3. After plaintiff filed an inmate appeal seeking the return of the materials, defendant reviewed them. *Id*. ¶¶ 39-40. Some of the materials were related to the Black Guerrilla Family ("BGF") prison gang. *Id*. The BGF is a violent prison gang founded in California prisons in the 1960s and still active today. *Id*. ¶¶ 16, 19. Founding member George Jackson is revered by the BGF as one of its founders and for his acts of violence against correctional officers. *Id*. ¶ 19; *Spain v. Rushen*, 883 F.2d 712-14 (9th Cir. 1989). During the annual, month-long BGF celebration called Black August, George Jackson and another member's death are commemorated by the BGF. Cavagnolo Decl. ¶ 20. Black August can also be a time when BGF gang members retaliate against correctional officers for the death of George Jackson and other members. *Id*.

Defendant states that the BGF is still active in SQSP and that its members pose a threat to the safety and security of staff and other inmates. *Id*. ¶¶ 18-19. Plaintiff disputes this statement and maintains that BGF is not active and that there have not been any prison lockdowns due to the BGF in the five years he has been at SQSP. Opposition1 at 8.

The materials that prison officials confiscated from plaintiff included: pictures of George Jackson; handwritten quotes by George Jackson; an article by Watani Tyehimba entitled, "History is a Weapon! Black August Resistance"; other writings about Black August; and articles and quotes from Leonard Peltier, Sundiata Acoli and Assata Shakur. Cavagnolo Decl. ¶ 39.

Because George Jackson was a founder of the BGF, if a prisoner possesses and displays photos, drawings, or tattoos of George Jackson, he could be perceived to be a member of the BGF by other inmates and could also be targeted for violence by enemies of the BGF. *Id*. ¶¶ 21-22. The writings and images that were confiscated are often used as training and recruitment material for the BGF. *Id*. ¶ 40. Plaintiff disputes that the confiscated materials could be used for training or recruitment. Opposition 1 at 7.

Defendant met with plaintiff on July 10, 2012, after reviewing the confiscated materials.

1  *Id.* ¶ 38. The non-BGF-related material was returned to plaintiff. Am. Compl. ¶ 43. Defendant
2  concluded that plaintiff was not affiliated with a gang and that there was no need to further
3  investigate him. Cavagnolo Decl. ¶ 45. Defendant did not begin the process of validating plaintiff
4  as a gang member. *Id.* ¶¶ 45, 47, 50, 52. Gang validation requires the submission of forms
5  describing why the inmate has been identified as a gang member and assigns points for the
6  different reasons. *Id.* ¶ 49. Defendant did not complete any forms for plaintiff, and no points
7  were assigned to plaintiff for possession of the written materials. *Id.* ¶ 53. As of October 31,
8  2016, the date of defendant's declaration filed with his summary judgment motion, plaintiff had
9  not been assigned any gang validation points based on defendant's search of the prison electronic
10 records database. *Id.* ¶ 53. Plaintiff states that defendant said that plaintiff would receive two
11 points towards gang validation. Opposition 1 (Docket No. 45) at 5. Defendant states that plaintiff
12 received no points towards validation. Cavagnolo Decl. ¶¶ 51-52.

13 Defendant told plaintiff that he would not return the written material related to Black
14 August and George Jackson. *Id.* ¶¶ 41-42. Defendant believed that returning the writings posed a
15 security threat, *Id.* ¶ 56; specifically, that it would compromise institutional security and put
16 plaintiff at risk from enemies of the BGF, even though plaintiff was not affiliated with the gang,
17 *Id.* ¶ 57, and that other inmates could use the material for training or recruitment, which would
18 increase the likelihood of violence to staff and other inmates. *Id.* ¶ 58.

19 Available to inmates in the SQSP library is a book entitled *Black Panthers for Beginners*.
20 Motion for Summary Judgment 2 ("MSJ2"), Lew Decl. ¶ 2. The book includes information about
21 George Jackson, Sundinata Acoli and Assata Shakur. *Id.* ¶ 3. The book also includes information
22 about the Black Panther Party Ten Point Program including Freedom from Jail. *Id.* ¶ 4.

23 In the summer of 2014, after the events giving rise to this case, plaintiff wrote an article
24 that was published in the *California Prison Focus* newsletter. Am. Compl. ¶ 57; MSJ2 (Docket
25 No. 61), Request for Judicial Notice, Ex. A.[1] The article discussed George Jackson, Watani

---

[1] The Court takes judicial notice that the prisoner publications and newsletters were in the public realm, not whether the contents are in fact true. *See Von Saher v. Norton Simon Museum of Art of Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

Tyehimba and the New Afrikan movement. MSJ2 Ex. A. BGF members sometimes refer to themselves as New Africans. *Harrison v. Milligan*, No. 09-4665 SI, 2013 WL 889656, at *1 (N.D. Cal. March 8, 2013).

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id*.

A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id*. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id*. at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). *Accord Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under § 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). A plaintiff alleging denial of equal protection under 42 U.S.C. § 1983 based on race or other suspect classification must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent. *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998). To state a claim for relief, the plaintiff must allege that the defendant state actor acted at least in part because of plaintiff's membership in a protected class. *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013).

Prisoners retain those First Amendment rights not inconsistent with their status as prison inmates or with legitimate penological objectives of the corrections system. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974). Regulations limiting prisoners' access to publications or other information are valid only if they are reasonably related to legitimate penological interests. *See Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). The Supreme Court recognized in *Turner* that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. *See Beard v. Banks*, 548 U.S. 521, 527 (2006). But at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere. *Id.* at 527-30.

As *Overton v. Bazzetta* pointed out, courts owe "substantial deference to the professional judgment of prison administrators." 539 U.S. 126, 132 (2003). *Turner* reconciled these principles by holding that restrictive prison regulations are permissible if they are "reasonably related" to legitimate penological interests, and are not an "exaggerated response" to such objectives. *Turner*, 482 U.S. at 87.

In *Turner*, the Supreme Court identified four factors to consider when determining whether a regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-90.

**DISCUSSION**

**Retaliation**

Plaintiff contends that his materials were confiscated and not returned in retaliation for the filing of his inmate appeal. Plaintiff's property arrived at SQSP in early December 2011, and the materials were confiscated on December 7, 2011. Plaintiff did not begin the inmate appeals process until December 28, 2011. It is undisputed that plaintiff did not receive any gang validation points as a result of this incident and has no gang validation points on his record.

There is no evidence that defendant took any adverse action against plaintiff for his protected conduct. Plaintiff's inmate appeal was not filed until after the materials were confiscated. Plaintiff does not allege any other protected conduct that occurred prior to the confiscation of the materials that could demonstrate that the materials were confiscated as a form of retaliation. There is no evidence or any allegations that defendant knew or had any interaction with plaintiff prior to the time the materials were confiscated.

Nor did defendant take any adverse action against plaintiff after the inmate appeals process began. Plaintiff was not validated as a gang member and it is undisputed that he received no gang

6

1   validation points.  All non-BGF-related property was returned to plaintiff after commencement of
2   the inmate appeal process.  Plaintiff alleges that defendant stated he would receive two gang
3   validation points.  Assuming that defendant did make this statement, plaintiff did not receive any
4   points, and the evidence does not show any other adverse action that was taken as a result of the
5   inmate appeal.  Finally, as will be discussed further below, the decision not to return the BGF-
6   related materials advanced a legitimate correctional goal.
7       Defendant has met his burden in demonstrating the absence of a genuine issue of material
8   fact.  Plaintiff has failed to show that there is a genuine issue for trial, and summary judgment is
9   granted to defendant for this claim.

**Equal Protection**

Plaintiff next argues that the refusal to return the materials associated with the BGF violated the Equal Protection Clause of the Fourteenth Amendment because defendant's actions were motivated by plaintiff's race.  Plaintiff says that had he been a Caucasian or Hispanic inmate, the possession of the materials at issue would have been permitted.  Plaintiff states that he will produce evidence to support his assertion that defendant's decision was racially motivated.  Opposition1 at 10.  However, plaintiff fails to present any evidence in his opposition to summary judgment.

There is no evidence that other inmates of different races who possessed similar materials about the BGF were treated differently.  Nor is there any evidence that other races were allowed to possess materials that could be used as indicia of affiliation with other gangs.  It is undisputed that California regulations prohibit prisoners from possessing material that is reasonably deemed to be a threat to legitimate penalogical interests and that inmate property is subject to search by correctional officers.

Plaintiff says he wrote notes about Adolf Hitler's *Mein Kampf* that were not confiscated.  This is irrelevant, and does not show that other similarly situated inmates were treated differently than he was with respect to BGF-related materials.  Defendant is entitled to summary judgment for this claim.

**First Amendment**

7

Plaintiff contends that the confiscation and refusal to return the BGF-related materials violates the First Amendment and was not related to legitimate penological interests. As discussed, prisoners retain those First Amendment rights not inconsistent with their status as prison inmates or with legitimate penological objectives of the corrections system. *See Pell*, 417 U.S. at 82. Courts look to the four factors set forth in *Turner* to determine whether the regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-90.

The Court directed defendant to file supplemental briefing with respect to the *Turner* factors and provided plaintiff an opportunity to file an additional opposition. Docket No. 57. Defendant filed supplemental briefing and specifically addressed each *Turner* factor. Docket No. 61. Plaintiff filed an additional opposition but failed to address the *Turner* factors. Docket No. 63.

It is generally the state's burden to establish a rational relationship between its limiting regulation or policy and the legitimate penological objectives it asserts. *See Beard*, 548 U.S. at 535-36 (finding that state established a "reasonable relation" between prison regulation that restricts access to newspapers, magazines, and personal photographs by inmates placed in long-term segregation unit and the prison's legitimate penological interests, including the need to motivate better behavior on the part of particularly difficult prisoners). However, because a court must accord deference in disputed matters of professional judgment to prison officials, "unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.* at 530. Prison security is a legitimate and neutral penological interest, and materials that pose a threat to security may be confiscated on the basis of content. *Stefanow v. McFadden*, 103 F.3d 1466, 1472 (9th Cir. 1996),

8

*superseded on other grounds by Navajo Nation v. U.S. Forest Svc.*, 479 F.3d 1024 (9th Cir. 2007); *see also Wilkinson v. Austin*, 545 U.S. 209, 227 (2005) (the state's first obligation is to ensure the safety of guards, prison personnel, the public and inmates).

With respect to the first *Turner* factor, defendant argues that there was a valid rational connection between the confiscation of the materials and the prison's need to prevent gang activity and violence. It is undisputed that the BGF is a prison gang with a history of violence and that George Jackson was one of the founders. Even though plaintiff was not in a gang, the possession of materials that are related to a gang puts the possessor and other inmates and staff at risk. The confiscation of the materials was rationally connected to the need to prevent prison gangs from having access to the material.

Plaintiff argues that there has not been any recent violence related to the BGF. Yet it is undisputed that the gang has a history of violence. Plaintiff states that the materials at issue could not be used for training or recruitment. Plaintiff has failed to point to sufficient evidence to support this assertion, and the Court defers to the professional judgment of prison officials. *See Beard* at 530.

Defendants note that plaintiff has alternative means of exercising his right to study and write about politics and history pursuant to the second *Turner* factor. While plaintiff was denied personal possession of these materials, the prison library includes materials related to the BGF that he can access and read. While plaintiff was denied his personal notes he was able to write a substantive news article in the *California Prison Focus* newsletter about the BGF and other similar issues.

For the third *Turner* factor, there would be a large impact in attempting to accommodate plaintiff's asserted right to possess these materials. Even though plaintiff is not a gang member, other inmates could seek to use or obtain the written materials and pictures which could pose a threat to plaintiff, other inmates and prison staff.

Nor is the prison regulation preventing possession of this material an exaggerated response to prison concerns. Prison gang activity is a serious problem and the BGF is a prison gang. Confiscating materials associated with this prison gang and that advance gang activities was not

an overreaction, and plaintiff has not shown that it was. The fourth factor is met in this case.

Defendant's confiscation of the materials was reasonably related to legitimate penological interests, and defendant is entitled to summary judgment. *See Taylor v. Milligan*, No. 14-0647 VC, at *12 (N.D. Cal. Oct. 13, 2016) (finding that confiscation of materials related to the BGF, George Jackson and the New Afrikan movement was reasonably related to a legitimate penological goal); *Harrison v. Milligan*, No. 09-4665 SI, 2013 WL 889656, at *7 (N.D. Cal. March 8, 2013) (confiscation of mail was constitutional because regulation prohibiting mail promoting gang activity was reasonably related to a legitimate correctional goal), *aff'd*, 604 F. App'x 571 (9th Cir. May 19, 2015); *Watts v. Ruggiero*, No. 13-1749 TLN AC, 2016 WL 916233, at *14 (E.D. Cal. March 10, 2016) (material associated with George Jackson and Black August is routinely construed by the California Department of Corrections and Rehabilitation ("CDCR") to reflect alliance with BGF); *Hawkins v. Russell*, No. 08-2791 CKD, 2012 WL 1027762, at *8-9 (E.D. Cal. March 26, 2012) (confiscation of book written by George Jackson constitutional due to his role as founding member of the BGF and its involvement in criminal activities inside and outside of prison).

**Qualified Immunity**

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Id*. at 205. A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that required determining a deprivation first and then deciding whether such right

was clearly established, as required by *Saucier*). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Pearson*, 555 U.S. at 236.

Qualified immunity applies to defendant because the Court has not found any constitutional violation. Even if the Court were to find that defendant had deprived plaintiff of a constitutional right, he would still be entitled to qualified immunity. As shown, district courts in the Ninth Circuit have regularly held that the confiscation of these items does not violate the First or Fourteenth Amendment. Consequently, it would not be clear to a reasonable officer in defendant's position that his conduct was unlawful. Defendant is entitled to qualified immunity for all of the claims.

**Unserved Defendants**

The Court ordered service on three defendants on January 7, 2016. Defendant Cavagnolo was served as discussed above. The summons was returned unexecuted as to McDonald and Tate on May 16, 2016. The CDCR had no current employment information or forwarding information regarding McDonald. Tate no longer worked for CDCR, and while a forwarding address was provided, the United States Marshal ("USM") went to the new address, but learned that Tate had moved with no forwarding address. Plaintiff was provided an extension to provide more information for service of the two remaining defendants. Plaintiff provided a new address for Tate, and on October 4, 2016, the Court ordered the USM to perform service. The address provided by plaintiff was an address where the USM already unsuccessfully attempted to perform service, yet the USM still went to the address and left a note. On January 12, 2017, the Court gave plaintiff another extension to provide more information for service and informed him that these defendants would be dismissed pursuant to Fed. R. Civ. P. 4(m) if service could not be effectuated. On February 24, 2017, the Court provided plaintiff with two document subpoena forms to obtain service information. On April 19, 2017, the Court ordered the USM to serve the subpoenas. Plaintiff requested another extension on May 4, 2017, yet despite several months passing, plaintiff has still not provided current information to enable the USM to conduct service.

The USM has attempted to effectuate service on several occasions, but has been

11

unsuccessful. Plaintiff has been provided several extensions and had been allowed approximately eighteen months for service, yet the two unserved defendants remain unserved. Therefore, the remaining defendants are dismissed pursuant to Fed. R. Civ. P. 4(m).

**CONCLUSION**

1. Defendant's motion for summary judgment (Docket No. 40, 61) is **GRANTED**.

2. Plaintiff's motion for an extension to serve the remaining defendants (Docket No. 59) is **GRANTED**, yet the unserved defendants are **DISMISSED** for the reasons set forth above.

3. The Clerk shall terminate all pending motions, enter judgment, and close the file.

**IT IS SO ORDERED.**

Dated: August 17, 2017

JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN DEROI SAWYER,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS MACDONALD, et al.,<br><br>Defendants. | Case No. 15-cv-00220-JD<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 17, 2017, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Kevin DeRoi Sawyer
P22673
San Quentin State Prison
San Quentin, CA 94974

Dated: August 17, 2017

Susan Y. Soong
Clerk, United States District Court

By: _____
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

13